IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2019

IN RE JOSIAH T.

**Appeal from the Juvenile Court for Knox County**
**No. 39481    Timothy E. Irwin, Judge**

———————————————————————

**No. E2019-00043-COA-R3-PT**

———————————————————————

A mother appeals the termination of her parental rights to her child.  Before trial, the mother moved to dismiss the petition to terminate her parental rights for failure to join the father of the child as a necessary party.  The juvenile court denied the motion.  And after a trial, the court found six statutory grounds for termination and that termination of the mother's parental rights was in the child's best interest.  We discern no error in the trial court's denial of the motion to dismiss.  But we conclude that the evidence was less than clear and convincing as to one of the statutory grounds relied on by the trial court for the termination of the mother's parental rights.  Still, the record contains clear and convincing evidence to support the remaining five grounds for termination and that termination is in the child's best interest.  So we affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Anna East Corcoran, Knoxville, Tennessee, for the appellant, Jennifer T.

Herbert H. Slattery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## I.

### A.

In 2014, Jennifer T. ("Mother") gave birth to Josiah T. His birth certificate listed no father. Josiah's father was later identified as Jean A. ("Father"). When Josiah was almost two years old, the Tennessee Department of Children's Services ("DCS") received a report that Mother had given birth to a baby girl, Neveah, and had admitted to hospital personnel that she abused suboxone while pregnant.

Mother was already known to DCS. Before Josiah's birth, DCS had removed two older children from Mother's custody based on concerns about Mother's substance abuse and possible medical neglect. The older children had been in the temporary custody of the maternal grandmother ("Grandmother") since 2009.

Mother and Josiah lived with Neveah's father, Robert D. After interviewing Mother and Robert D., DCS petitioned the Juvenile Court of Knox County, Tennessee, to declare Josiah and Neveah dependent and neglected. DCS also asked that Grandmother be awarded temporary custody of the children. The court found probable cause to believe the children were dependent and neglected and issued an immediate protective custody order. The order awarded temporary physical custody to Grandmother and required that any visitation by the parents be supervised.

Nine months later, DCS received a report of a domestic disturbance at the home Mother shared with Robert D. Reportedly, when the maternal grandfather arrived to pick up Josiah and Neveah from an unsupervised visit, Robert D. threatened him with a tire iron. When interviewing Mother a few days later, the DCS case manager found Josiah and Neveah in the care of Mother and Robert D. without supervision. During the interview, Mother admitted that she abused drugs and lacked stable housing. Mother tested positive that day for THC and suboxone.

Because Grandmother was not supervising visitation as ordered by the court, DCS again petitioned to adjudicate Josiah and Neveah dependent and neglected. But this time DCS sought physical custody. On April 25, 2017, Josiah and Neveah entered foster care. Shortly thereafter, Mother's older children, who were also in Grandmother's custody, entered foster care.

On May 22, 2017, DCS, with Mother's participation, developed an initial permanency plan with the twin goals of return to parent and exit custody with relative. Mother tested positive that day for amphetamines, buprenorphine, and methamphetamine.

2

In addition to Mother's obvious substance abuse issues, the plan addressed Mother's mental health, parenting skills, history of domestic violence, and lack of sufficient resources to provide for the children.

Under the plan, Mother's main responsibilities included:

- Resolving pending criminal charges and not incurring new charges;
- Passing random drug screens;
- Completing an alcohol and drug assessment and following all recommendations from the assessment;
- Taking medication as prescribed;
- Complying with random pill counts;
- Visiting children regularly as scheduled;
- Paying child support;
- Completing a series of parenting classes;
- Completing a mental health assessment and following any recommendations from the assessment;
- Addressing anger management and domestic violence issues through individual therapy or classes;
- Obtaining and maintaining a legal source of income;
- Obtaining and maintaining safe and stable housing;
- Maintaining contact with DCS;
- Signing necessary releases; and
- Providing verification of the completion of her responsibilities.

DCS revised the plan twice, but Mother's responsibilities remained the same.

Following a dependency and neglect hearing on July 21, 2017, the court found, by clear and convincing evidence, that Mother had abused suboxone when she knew she was pregnant with Neveah.[1] By the same quantum of proof, the court found that Neveah was a victim of severe abuse, as defined in Tennessee Code Annotated § 37-1-102(b)(22)(A) (Supp. 2019). The court also adjudicated Mother's four children dependent and neglected based on, among other things, the severe abuse finding and Mother's substance abuse.

DCS referred Mother to the necessary service providers to schedule a dual assessment, but she waited almost six months to complete the assessment. Then she failed to follow the resulting recommendations. The service provider had recommended that Mother enroll in medication management and an intensive outpatient program for

---

[1] The court entered a final order reflecting its findings on December 8, 2017.

both substance abuse and mental health. Mother failed another drug screen after completing the assessment. Although the plan required Mother to complete a second assessment under such a circumstance, she did not.

At this point, Mother was unemployed and living off and on with various relatives. In late February 2018, Mother belatedly enrolled in an intensive outpatient therapy program. But she was discharged a few months later for poor attendance.

On March 30, the children began a trial home placement with Grandmother. But the placement was suspended in May after DCS discovered that Grandmother was allowing Mother unsupervised visitation with the children. DCS removed exit custody with relative as a goal in the permanency plan. The new goals were return to parent or adoption.

In June, fourteen months after the children entered foster care, Mother again enrolled in the recommended drug and mental health treatment program. Despite failing multiple drug screens in June and July, Mother completed the program on August 13, 2018. She also began working for a daily employment company and paying child support. And she completed parenting classes.

Sadly, her sobriety was short lived. On September 5, she tested positive for THC, amphetamines, and methamphetamines. She admitted to the DCS family services worker that she had relapsed again. DCS assisted her with enrolling in another drug treatment program at a halfway house. But Mother stayed only a few short weeks before she withdrew, claiming that she would do better on her own.

B.

On September 19, 2018, DCS petitioned to terminate Mother's parental rights to three of her children, including Josiah.[2] The petition alleged six grounds for termination: abandonment by failure to support; abandonment by failure to provide a suitable home; persistence of conditions; severe child abuse; substantial noncompliance with the permanency plan; and failure to manifest an ability and willingness to parent. DCS filed a separate petition to terminate Father's parental rights to Josiah.[3]

Mother moved to dismiss the petition to terminate her parental rights and/or for a continuance. Citing Tennessee Code Annotated § 36-1-117(a) (Supp. 2019), she argued that both parents were necessary parties to the termination proceeding. And she maintained that the petition should be dismissed under Tennessee Rule of Civil Procedure

---

[2] One child had exited foster care in February and was living with the paternal grandmother.

[3] Father established paternity in February 2018.

4

19.01. Alternatively, she sought additional time to complete her responsibilities in the permanency plan.

The court denied the motion. Father's parental rights were terminated on December 4, 2018. The next day, the court conducted a trial on the petition to terminate Mother's parental rights. The only witnesses were the DCS family services worker ("FSW") and Mother.

The FSW related the circumstances that led to the children entering foster care and described Mother's lack of progress in fulfilling her responsibilities in the permanency plans. She explained that Josiah and Neveah had been in the same foster home throughout 2018 except for the trial home placement with Grandmother. The children had bonded with the foster family. At the time of trial, Josiah had speech and behavioral issues. The foster family was addressing his needs appropriately. And they were open to adoption.

For her part, Mother acknowledged her extended struggle with substance abuse. She began using drugs when she was thirteen. But she maintained that, despite her recent relapse, she had finally turned her life around. After she left the halfway house, she continued attending narcotics anonymous meetings, found a sponsor, and started working through a 12-step recovery program. She explained that she currently attended support meetings at various locations twice a week. And she passed her most recent drug screen in October.

She had also enrolled in medication management. She was taking her medication for depression and anxiety as prescribed. And she planned to schedule individual therapy in the near future.

Her employment was through a daily work company. At the time of trial, she had been working with the company off and on for five months. Her felony conviction made it difficult to find more steady employment. She generally received work assignments three to four days per week. Child support payments were being withheld from her paycheck. As for housing, she had been living with her aunt off and on for the previous six months.

Mother visited her children regularly. She only missed three visits in 22 months mainly due to transportation issues. She relied on relatives for her transportation. Her driver's license had been revoked ten years ago for unpaid tickets, and she had never pursued reinstatement. She described her close bond with her children. According to Mother, "my children are my purpose in life."

The juvenile court found that DCS had proven by clear and convincing evidence all alleged grounds for termination of Mother's parental rights to Josiah. The court

further found clear and convincing evidence that termination of Mother's parental rights was in Josiah's best interest. The court postponed decision on Mother's parental rights to the other two children.

## II.

Before addressing the issues raised by Mother for review, we must first determine whether this Court has jurisdiction over this appeal. The subject matter jurisdiction inquiry for appellate courts begins with a determination of if and when a final judgment was entered. Under Tennessee Rule of Appellate Procedure 3(a), an appeal "as of right" only lies from a final judgment. Tenn. R. App. P. 3(a); *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003). Generally, a final judgment is a judgment "that resolves all of the parties' claims and leaves the court with nothing to adjudicate." *Ball v. McDowell*, 288 S.W.3d 833, 836-37 (Tenn. 2009). Here, the juvenile court "reserved its ruling regarding whether it [wa]s in [two of] the children's best interest to terminate the parental rights of [Mother]." Thus, the judgment Mother appealed was not final.

Under Tennessee Rule of Civil Procedure 54.02, the trial court may direct the entry of a final judgment "as to one or more but fewer than all of the claims or parties." But a court may do so "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Tenn. R. Civ. P. 54.02. The juvenile court's judgment provided that it "constitute[d] a final judgement as to the claims set out above as to [Mother] regarding [Josiah T.], and is immediately appealable as of right to the Court of Appeals pursuant to Tenn. R. App. 3(a)." While the language contained in the judgment might satisfy the Rule 54.02 requirement of "an express direction for the entry of judgment," the judgment lacks a finding that "there [wa]s no just reason for delay." Such a finding is "an absolute prerequisite" to an appeal. *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983); *see also Duffer v. Lawson*, No. M2009-01057-COA-R3-CV, 2010 WL 3488620, at \*5 (Tenn. Ct. App. Sept. 3, 2010) (holding that an order omitting "magic language" under Rule 54.02 "is not a final and appealable judgment"). Absent the finding, "the order is interlocutory and can be revised at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all parties."[4] *Fox*, 657 S.W.2d at 749.

Still we find it appropriate to exercise jurisdiction in this case despite the lack of the requisite finding by the juvenile court. We are permitted to suspend Tennessee Rule of Appellate Procedure 3(a) for "good cause." Tenn. R. App. P. 2; *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990). We find good cause to do so in this instance

---

[4] The trial court's authority under Tennessee Rule of Civil Procedure 54.02 "is not absolute." *Crane v. Sullivan*, No. 01A01-9207-CH-00287, 1993 WL 15154, at \*1 (Tenn. Ct. App. Jan. 27, 1993). We do not reach the issue of whether certification under Rule 54.02 would have been appropriate under the facts of this case.

because of the grave nature of the proceedings and the importance that the parental termination statutes place on expeditious resolution of these matters. Trial courts must ensure that hearings on petitions to terminate take place "within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interest of the child." Tenn. Code Ann. § 36-1-113(k) (Supp. 2019). And both the trial court and we are required to expedite and give termination of parental rights cases priority. *Id.* § 36-1-124(a), (b) (2017). Our General Assembly has expressed its intent "that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties." *Id.* § 36-1-124(c). Given both the consequences of terminating parental rights and the importance placed on permanency for the child, we see no just reason to delay this matter further.

**III.**

On appeal, Mother raises three issues for our review. The first two relate to the juvenile court's denial of her motion to dismiss the case because DCS did not name Father as a party. Under Tennessee Rule of Civil Procedure 12.02(7), a party can raise as a defense the "failure to join a party under [Tennessee] Rule [of Civil Procedure] 19." Tenn. R. Civ. Proc. 12.02(7). Taken together, Rules 12 and 19 permit a party to seek dismissal of a case if an "indispensable" person cannot be made a party to the litigation. *See id.* & 19.02. Rule 19 in particular "is designed to protect the interests of absent persons as well as those already before the court from multiple litigation and inconsistent judicial determinations." *Citizens Real Estate & Loan Co. v. Mountain States Dev. Corp.*, 633 S.W.2d 763, 766 (Tenn. Ct. App. 1981). We review a decision on a motion to dismiss for failure to join an indispensable party for an abuse of discretion. *McNabb v. Highways, Inc.*, 98 S.W.3d 649, 651-52 (Tenn. 2003).

Few Tennessee cases have addressed dismissal under Tennessee Rule of Civil Procedure 12.02(7). In interpreting the Tennessee Rules of Civil Procedure, "we consult and are guided by the interpretation that has been applied to comparable federal rules of procedure." *Turner v. Turner*, 473 S.W.3d 257, 268 (Tenn. 2015). Under the federal rules, a motion to dismiss for failure to join a party requires a three-part inquiry. *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005). Despite the differences between our rule and the federal rule governing joinder, a three-part inquiry is also appropriate under Tennessee Rule of Civil Procedure 12.02(7). First, the court must determine whether the nonparty falls within a category of persons described in Rule 19.01 that "shall be joined as a party." Tenn. R. Civ. P. 19.01; *see also Peabody W. Coal Co.*, 400 F.3d at 779 (describing first step of the three-party inquiry). Second, if the nonparty should be joined under Rule 19.01, the court must determine whether joinder is feasible. *Peabody W. Coal Co.*, 400 F.3d at 779. Joinder is not feasible if the nonparty is not subject to the court's personal jurisdiction. *See* Tenn. R. Civ. P. 19.01 ("A person who is subject to service of process shall be joined as a party . . . ."). Third and "[f]inally,

7

if joinder is not feasible, the court must determine . . . whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Peabody W. Coal Co.*, 400 F.3d at 779. Rule 19.02 provides factors to be considered in making the determination of whether a nonparty is indispensable. Tenn. R. Civ. P. 19.02.

The first inquiry requires a review of the text of Rule 19.01. Rule 19.01 describes two categories of persons that shall be joined. The first category is a person whose absence would preclude the court from granting "complete relief . . . among those already parties." *Id.* 19.01. The second type is a person claiming "an interest relating to the subject of the action" whose "absence may (i) as a practical matter impair or impede the person's ability to protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest." *Id.* The party moving to dismiss bears the burden of showing that there is a nonparty that falls within one or both of the categories. *See Disabled in Action of Penn. v. Se. Penn. Transp. Auth.*, 635 F.3d 87, 97 (3d Cir. 2011).

According to Mother, Father falls within both categories described in Rule 19.01. Mother claims that, without Father, the court could not grant complete relief, relying on Tennessee Code Annotated § 36-1-117(a). Mother reads the statute as requiring that, unless parental rights have previously been surrendered or terminated, the biological mother and the established father of a child must be made parties to the same termination proceeding. Mother's argument, however, is founded on a misreading of the statute.

Tennessee Code Annotated § 36-1-117(a) is part of our adoption statutes. *See* Tenn. Code Ann. § 36-1-101(a) (2017) (providing that the primary purpose of this part of the Tennessee Code "is to provide means and procedures for the adoption of children and adults"). Subpart (a) of the section specifies who must be made parties to an adoption proceeding. Unless a parent or guardian has surrendered their rights to the child or they have consented to the adoption or they have waived their rights to the child or their rights have been terminated,

> the legal parents, guardian of the person of the child or of an adult, the biological mother, and the established father or putative father of the child must be made parties to the adoption proceeding or to a separate proceeding seeking the termination of those rights, and their rights to the child must be terminated by a court to authorize the court to order the adoption of the child or adult by other persons.

*Id.* § 36-1-117(a). In other words, a child cannot be adopted unless the rights of all parents and guardians have been surrendered, waived, or terminated or they have consented to the adoption. *See In re Shelby L.B.*, No. M2010-00879-COA-R9-PT, 2011

WL 1225567, at *6 (Tenn. Ct. App. Mar. 31, 2011) ("It is axiomatic that an adoption cannot occur as long as the parental rights of the legal or biological parent(s) still exist and are in effect."). We have previously held that an adoption petition is subject to dismissal if the petition does not seek to terminate all existing parental rights to the child. *See In re Francis P.*, 532 S.W.3d 356, 366 (Tenn. Ct. App. 2017) (holding that the trial court properly dismissed petition to terminate and/or adopt child when petition only sought to terminate father's parental rights, not mother's rights).

Tennessee Code Annotated § 36-1-117(a) has no application in this case. Although the end goal is adoption of Josiah, the only remedy sought by DCS was the termination of Mother's parental rights. [5] DCS could be afforded complete relief without Father's participation. *See In re M.L.P.*, 281 S.W.3d 387, 391-92 (Tenn. 2009) (holding that Tennessee Code Annotated § 36-1-117(a) only requires "the legal guardians of a child [to] be joined as parties when *their rights to the child* are being terminated").

Next, Mother argues that Father must be joined under Rule 19.01 because he was unable to protect his interest in this litigation without being joined as a party. We disagree. Father's parental rights were terminated before this trial. He had no interest to protect. *See* Tenn. Code Ann. § 36-1-113(l)(1) ("An order terminating parental rights shall have the effect of severing forever all legal rights and obligations . . . ."); *see also Shell v. Law*, 935 S.W.2d 402, 410 (Tenn. Ct. App. 1996) (holding legal father whose parental rights had been terminated had no interest in outcome of paternity action against biological father). But even if Father's parental rights had not been terminated, this proceeding only concerned Mother's parental rights. Father's parental rights could not have been affected. Mother's concern that one parent might be adversely affected by the proof offered for or against the other parent is also unfounded. Because Father was not a party or in privity with a party in Mother's case, the determination of a particular issue of law or fact in Mother's case would not be preclusive as to Father. *See In re Bridgestone/Firestone*, 495 S.W.3d 257, 267 (Tenn. Ct. App. 2015).

Because Mother failed to show that Father had to be joined under Tennessee Rule of Civil Procedure 19.01, we do not reach the second and third parts of the inquiry. The court properly denied Mother's motion to dismiss.

---

[5] We note that the statute governing termination specifies that "any person or persons entitled to notice pursuant to § 36-1-117 shall be named as defendants in the petition to terminate parental rights or in the adoption petition and shall be served with a copy of the petition as provided by law." *See* Tenn. Code Ann. § 36-1-113(d)(3)(B). Tennessee Code Annotated § 36-1-117 requires that notice be given to "[a]ny public or private agency that may have custody or complete or partial guardianship of the child." *Id.* § 36-1-117(e).

**IV.**

For her final issue, Mother contends that the proof offered by DCS was insufficient to terminate her parental rights. Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A. GROUNDS FOR TERMINATION

Mother does not challenge the grounds for termination of parental rights relied on by the court. Nonetheless, we must "review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Among other things, "abandonment"

includes the failure "to support or . . . make reasonable payments toward the support of the child" during the four months immediately preceding the filing of the petition to terminate parental rights. *Id.* § 36-1-102(1)(A)(i) (Supp. 2019). Here, because the petition was filed on September 19, 2018, the relevant four-month period is June 19, 2018, to September 18, 2018, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period). A parent has abandoned a child under this statutory definition if the parent has failed "to provide more than token payments toward the support of the child" during the relevant time period. Tenn. Code Ann. § 36-1-102(1)(D).

a. Failure to Support

Mother was ordered to pay $40 per month in child support for each child. During the relevant time period, she paid a total of $45 in child support for Josiah, an amount the trial court found to be merely token. Support payments are token if "the support, under the circumstances of the individual case, is insignificant given the parent's means." *Id.* § 36-1-102(1)(B). A parent's means includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013).

Mother began working approximately six or seven weeks before the termination petition was filed. She testified that on average she worked three or four days per week and, after withholding, brought home $30 per day. At best, she earned $840 during the four months before the petition was filed. Her household budget shows monthly expenses of $120. She also paid an additional $90 toward the support of Josiah's half-siblings during this four-month period.

Based on this evidence, we cannot say that Mother's payments toward Josiah's support during the relevant period were insignificant given her means. The burden fell on DCS to prove that Mother's payments were "token support" within the meaning of the statute.[6] *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); Tenn. Code Ann. § 36-1-102(1)(A)(i), (D). We conclude that DCS failed to meet this burden by clear and convincing evidence.

b. Failure to Provide a Suitable Home

Abandonment also includes failure to establish a suitable home for the child. Tenn. Code Ann. § 36-1-102(1)(A)(ii). When the petition was filed, this definition of abandonment provided a ground for the termination of parental rights when:

---

[6] Although related, the concept of "token support" is distinct from the concept of "willfulness" in failing to support. The parent bears the burden of proving that a failure to support was not willful. Tenn. Code Ann. § 36-1-102(1)(I).

11

(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of [DCS];

(b) The juvenile court found . . . that [DCS] made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, [DCS] made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that the [parent] will be able to provide a suitable home for the child at an early date.

*Id.*

"A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

Here, Josiah was removed from Mother's custody and placed in the custody of DCS on April 25, 2017. The juvenile court found that DCS made reasonable efforts to prevent the removal, and we agree.

While this record contains scant evidence of DCS's efforts to assist Mother in establishing a suitable home during the relevant four month period, DCS's efforts clearly equaled or exceeded Mother's efforts. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]"). DCS developed a permanency plan, referred Mother to the necessary services providers, facilitated visitation with the children, and administered random drug screens. But Mother took little or no action for six months.

12

Even at trial, Mother was unable to provide a suitable home for Josiah. She was living with various relatives. She had only been drug free less than three months, and her support system was weak. She was not participating in the recommended individual therapy for anger management and domestic violence. Mother's lack of progress throughout this case demonstrates such a lack of concern for her child that it appears unlikely that she will be able to provide a suitable home for Josiah at an early date.

All the elements of the second statutory definition of abandonment were satisfied by clear and convincing evidence. So the trial court correctly concluded that termination of Mother's parental rights on the ground of abandonment for failure to provide a suitable home was warranted.

2. Substantial Noncompliance

The juvenile court also found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements were "reasonable and are related to remedying the conditions that necessitate foster care placement." *Id.* § 37-2-403(a)(2)(C) (2014). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

We agree with the trial court's finding that the permanency plan requirements developed for Mother and Josiah were reasonable and related to remedying the conditions that prevent reunification of this family. Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

The evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plans. Mother waited six months to start working on her responsibilities and made very little progress until August 2018. In August, Mother finally completed both parenting classes and an inpatient treatment program and found at least temporary employment. But she quickly relapsed, thus triggering the requirement to obtain another alcohol and drug assessment. She never

13

completed a second assessment. And she withdrew from the drug treatment program at the halfway house, opting instead to attend meetings twice a week. Mother has never addressed her anger management or domestic violence issues. And she remains homeless.

Certainly, parents with drug addictions can "have false starts and set backs, as well as successes and, regrettably, backsliding," and we should take that into account. *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *11 (Tenn. Ct. App. Apr. 14, 2005). But "a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). The plan "is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *Id.* Substantial compliance requires parents to "complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *Id.* Mother's efforts fell short.

## 3. Persistence of Conditions

The juvenile court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). This ground for termination focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533. So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . ., or other

14

conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . .;

      (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

      (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

At the time of trial, Josiah had been removed from Mother's custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that conditions preventing Josiah's safe return to Mother remained. Mother was homeless. She relapsed as recently as September 5. She had yet to address her issues with anger management or domestic violence.

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Despite her optimism, Mother's recent relapse and lack of progress on other issues makes reunification in the near future unlikely.

We also have little difficulty in concluding that continuation of the parent and child relationship greatly diminishes Josiah's chances of early integration into a safe, stable, and permanent home. At the time of trial, Josiah had been in foster care for 20 months. He had bonded with his foster family, who provided a safe and stable home. Mother, on the other hand, remains unable to offer either.

4. Severe Child Abuse

The juvenile court found DCS had proven severe child abuse as a ground for termination. Under Tennessee Code Annotated § 36-1-113(g)(4), it is a ground for termination if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). As this Court has previously explained, "under this provision in the termination statutes, once the finding of severe child abuse in the dependency and neglect proceedings becomes final, '[t]he ground itself is proved by [the] prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at

15

the termination hearing.'" *In re J.C.H.*, No. W2012-01287-COA-R3-PT, 2012 WL 6466631, at *10 (Tenn. Ct. App. Dec. 14, 2012) (quoting *Tenn. Dep't of Children's Servs. v. M.S.*, No M2003-01670-COA-R3-CV, 2005 WL 549141, at 10 (Tenn. Ct. App. Mar. 8, 2005)); *see also In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (holding the issue of whether a mother committed severe child abuse was res judicata where the issue was fully litigated in a previous dependency and neglect action).

The record reflects that, on December 8, 2017, the juvenile court entered a final order finding by clear and convincing evidence that Mother had committed severe child abuse against her daughter Neveah, as defined in Tennessee Code Annotated § 37-1-102. In the same order, the juvenile court adjudicated Josiah dependent and neglected, in part, based on the severe child abuse finding. The juvenile court's order was not appealed, and thus, grounds for termination exist based on severe abuse.

5. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

Finally, the court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

We conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was appropriate. Mother did not exhibit an ability and willingness to personally assume legal and physical custody or financial responsibility for Josiah. Mother had recently suffered another relapse. Her anger management and domestic violence issues remained unaddressed. She was homeless with minimal income. Her recent efforts notwithstanding, Mother remained unable to care for Josiah even at the time of trial.

The evidence is equally clear and convincing that returning Josiah to Mother's custody would pose a risk of substantial harm to his physical or psychological welfare. Mother has no home to offer Josiah. And the risk of another relapse is significant. Her only support system is attending Narcotics Anonymous meetings in various locations,

16

depending on whether she can find transportation. She is not engaged in individual therapy. And her announced intention to sign up for therapy in the near future is insufficient to remove the very real risk of substantial harm to Josiah.

## B. BEST INTEREST

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in Josiah's best interest. The court emphasized Mother's lack of a lasting adjustment, the detrimental effect of a change in caretakers, the severe abuse finding, Mother's inability to provide a safe home, Mother's mental and emotional status, and her failure to pay the required amount of child support. Mother contends the court failed to give proper weight to her relationship with Josiah and her recent sobriety.

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available

social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). We agree that Mother has made an adjustment; the question is whether the change will last. The trial court found Mother had never been able to maintain her sobriety "for any consistent period of time." The evidence does not preponderate against this finding. Mother relapsed within one month of completing an intensive outpatient drug treatment program. Given her history, we cannot discount the very real possibility that she will relapse again.

The third and fourth factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court found Mother had maintained regular visitation and had a relationship with her son. These factors weigh against termination.

The court assigned more weight to the fifth factor, which evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). Despite the relationship between Mother and Josiah, the trial court found a change in caregivers would be detrimental. The evidence does not preponderate against this finding. Josiah was removed from Mother's custody when he was less than two years old. At the time of trial, he had lived with the same foster family for a year. He had bonded with the family, who had provided the only safe and stable home he had ever known. The family has been diligent in addressing his needs, and they are open to adoption. This factor favors termination.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). This factor also favors termination. Mother committed severe child abuse against Josiah's half-sibling.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). Mother is homeless. And as recently as September 5, Mother tested positive for THC, amphetamines, and methamphetamines. It is simply too soon to tell whether Mother has successfully overcome her substance abuse issues such that she can be a safe and stable caregiver.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and

18

supervision for the child." *Id.* § 36-1-113(i)(8). Mother suffers from anxiety and depression. She has only recently begun taking medication for her mental health issues. And she has yet to enroll in individual therapy. Whether she can effectively provide safe and stable care for Josiah is questionable.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). Mother's record of support also weighs in favor of terminating parent rights.

We conclude that DCS proved, by clear and convincing evidence, that termination of parental rights was in Josiah's best interest. Although some factors were in Mother's favor, the combined weight of the proven facts amount to clear and convincing evidence that termination of Mother's parental rights is in Josiah's best interest.

## V.

The trial court did not err in denying the motion to dismiss the petition to terminate Mother's parental rights for failure to join Father under Tennessee Rule of Civil Procedure 19. Father was not a necessary party to this proceeding.

Upon our review of the record, we vacate the juvenile court's finding of abandonment by failure to support. Still, the record contains clear and convincing evidence to support terminating Mother's parental rights on the remaining grounds. The record also contains clear and convincing evidence that termination is in the child's best interest. Thus, we affirm the judgment terminating Mother's parental rights.

_____

W. NEAL MCBRAYER, JUDGE